IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PETER ANDREW STINSON<br><br>Defendant. | Case No. 1:25-MJ-373 |

## **UNITED STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF PROBABLE CAUSE**

*"You know you need to find me. Maybe I'm lying. Maybe I do have the skills. Maybe I've got it all figured out how to pop the orange ball. Or maybe I don't. It doesn't matter. People will try. We pray for success."*

On February 11, 2025, Peter Stinson directly spoke to law enforcement to alert them, as he had done on several other occasions, to come find him because he was planning to kill the President of the United States, Donald J. Trump. This threat was direct, affirmative and unambiguous. He was announcing his intention to assassinate the President in a manner that was unquestionably a serious expression of his intent to harm his victim, and constitutes speech that is not afforded the protections of the First Amendment of the United States Constitution. His threat on February 11, especially when considered in context with his other threats, discussed below, and his background as a former law enforcement officer and award-winning sharpshooter, give rise to probable cause that he has violated 18 U.S.C. § 871.

1

## PROCEDURAL BACKGROUND

On June 13, 2025, Stinson was arrested pursuant to an arrest warrant and criminal complaint charging him with violations of 18 U.S.C. §871 (Threats against the President). ECF Nos. 1-7. On June 16, 2025, Stinson had his initial appearance before this Court. ECF No. 8. On June 17, 2025, Stinson filed a Memorandum in Support of Pretrial Release. ECF No. 14. On June 18, 2025, this Court held a preliminary hearing and detention hearing, after which it ordered Stinson released to home detention with additional conditions. ECF Nos. 18-19. The Court continued the preliminary hearing until July 1, 2025, and ordered the government to submit a filing on the issue of probable cause, which the Government submitted on June 25, 2025. ECF No. 21 ("Gov't PC Brief"). On June 27, 2025, the Court ordered the Government to file a supplemental brief identifying the top five statements made by Stinson that the Government believes to be "true threats" under 18 U.S.C. § 871, and explaining the legal basis for its position under First Amendment law. ECF 26.

The Government assumes the Court's familiarity with the relevant facts in this case, as detailed in the affidavit in support of Stinson's criminal complaint. See ECF No. 2 ("Compl.").

## LEGAL STANDARD

The applicable legal standard is probable cause. "Probable cause is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians act," and the determination can be "made reliably without an adversary hearing . . . it is and has always been thought sufficient to hear only the prosecutor's side" for a probable cause determination. Kaley v. United States, 571 U.S. 320 (2014) (quotations and citations omitted).

# APPLICABLE LAW

"The Nation undoubtedly has a valid, even an overwhelming, interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence." United States v. Patillo, 431 F.2d 293, 295 (4th Cir. 1970), adhered to, 438 F.2d 13 (4th Cir. 1971) (citation omitted). "Nevertheless, a statute such as [18 U.S.C. §871], which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." Id. To determine whether speech threatening the President violates 18 U.S.C. §871, the Fourth Circuit has required proof of the following two elements: "(1) the proof of a true threat and (2) that the threat is made knowingly and willfully." United States v. Lockhart, 382 F.3d 447, 449–50 (4th Cir. 2004) (internal quotations and citation omitted).

In determining whether these two elements have been met, the Fourth Circuit undertakes two steps: 1) an objective analysis to determine if the statement was a true threat, and 2) a subjective analysis to determine if the speaker had the requisite *mens rea*. The first step, an application of an objective person analysis, requires a determination as to whether "a reasonable recipient who is familiar with the circumstances would interpret [the threat] as a serious expression of an intent to do harm." United States v. White, 810 F.3d 212, 219 (4th Cir. 2016). A true threat "means a serious threat as distinguished from mere political argument, idle talk or jest." United States v. Spruill, 118 F.3d 221, 228 (4th Cir. 1997). That said, the government need not prove that the speaker actually intended to carry out a true threat or even had the ability to carry it out for purposes of a true threat analysis. See United States v. Darby, 37 F.3d 1059, 1064 n.3 (4th Cir. 1994). "Generally, what is or is not a true threat is a jury question." United

3

States v. Roberts, 915 F.2d 889 (4th Cir. 1990). In examining true threats, the Fourth Circuit has emphasized that "[c]ontext is important." Id.; see also Gov't PC Brief at 3-4 (collecting cases).

Under the second step, courts must determine whether the speaker had sufficient *mens rea* to violate §871. The *mens rea* requirement for a true threat under § 871 is more specific under long-established Fourth Circuit precedent. United States v. Butler, No. 7:22-CR-00046, 2025 WL 893856, at *14 (W.D. Va. Mar. 24, 2025). "Where a true threat against the person of the President is uttered without communication to the President intended, the threat can form a basis for conviction under the terms of Section 871(a) only if made with a present intention to do injury to the President . . . [or] to restrict the movements of the president. Importantly, the trier of fact may infer intent to restrict the president's movements from the nature of the publication of the threat, i.e., whether the person making the threat might reasonably anticipate that it would be transmitted to law enforcement officers and others charged with the security of the President." Butler, 2025 WL 893856, at *14 (internal quotations omitted) (citing United States v. Patillo, 438 F.2d 13, 16 (4th Cir. 1971) (en banc)); see also Lockhart, 382 F.3d at 450.

**A. In United States v. Lockhart, the Fourth Circuit Engages in the Requisite Analyses under Section 871.**

In Lockhart, the Fourth Circuit affirmed a conviction under Section 871(a), and engaged in both the objective and subjective analyses required by the statute. In Lockhart, a job applicant gave a threatening letter in April 2003 to a manager at a Food Lion grocery store that "contain[ed] a number of complaints and assertions about the United States government, specifically commenting that "George Bush is busy killing people in Iraq" and ended with the following threat: "if George Bush refuses to see the truth and uphold the Constitution, I will personally put a bullet in his head." Id. at 449. Lockhart had written letters in the past, which

4

were in the possession of the Secret Service, and at the time of her 2003 threat, "the Secret Service already had a file 6-8 inches thick of letters" from her. Id. For example, eleven years prior, in 1992, she wrote a letter containing a threat to the President and mailed it to Apple Computer Corporation." Id. The defendant argued that her conduct was not a "true threat" under Watts v. United States, 394 U.S. 705, 707–708 (1969), and therefore is protected by the First Amendment. The Fourth Circuit disagreed.

The Court of Appeals explained that in Watts, the Supreme Court drew a distinction between threats that are "political hyperbole" and thus entitled to constitutional protection, and "true threats" that are not protected under the First Amendment. In Watts, a protester made statements made at an anti-war rally at the Washington Monument. After referring to his draft classification, the defendant stated "[i]f they ever make me carry a rifle, the first man I want to get in my sights is L.B.J." The crowd laughed after the defendant made the statement. Watts, 394 U.S. at 706. To determine whether the protester's statement was a "true threat," the Supreme Court considered the context in which the threat was made, including "the expressly conditional nature of the statement" and "the reaction of the listeners." Id. at 708.

The Fourth Circuit held that Lockhart's 2003 threatening letter, considering the entire context, constituted a true threat, unlike the statement made in Watts. Lockhart, 382 F.3d at 452. First, the Court of Appeals noted that "there is nothing in [Lockhart's letter] that signals it is intended to be a joke" and she gave it "to the Food Lion manager, whom she didn't know before entering the store, in a serious manner without suggesting it was meant as jest." Id. Second, the court noted that "although the letter contains political statements, the manner in which Miss Lockhart gave the letter to its recipients is different from a speech at a political rally. Nothing in Miss Lockhart's actions suggest she intended to engage in political discourse." Id. Finally, the

5

court also noted that Lockhart's threat was not conditional in the same manner as the threat in Watts, which "involved a threat made 'expressly conditional' on being drafted into the United States military." Id. The court noted, to the contrary, that Lockhart's threat "does not indicate what events or circumstances would prevent the threat from being carried out beyond the broad statement that the President 'must see the truth' and 'uphold the constitution.'" Id. For these reasons, the Fourth Circuit found that Lockhart's threat couldn't be considered "either legitimate political hyperbole or jest when examined in the context in which it was made, nor was it expressly conditional." Id. Therefore, the threat constituted a "true threat" not protected by the First Amendment. The Fourth Circuit also found that Lockhart's threats were knowing and willing, and therefore satisfied the *mens rea* requirement under Section 871, because she "knew in due course [the threat] would wind up in the hands of law enforcement." Id. at 451.

## ARGUMENT

In February 2025, a few weeks after the inauguration of President Trump, Stinson began threatening to kill the President using language constituting "true threats" that are not protected under the First Amendment. The following threats, for example, evidence Stinson's serious intent to assassinate the President, especially when considered in context of all of his other statements on social media:

- February 11, 2025: "You know you need to find me. Maybe I'm lying. Maybe I do have the skills. Maybe I've got it all figured out how to pop the orange ball. Or maybe I don't. It doesn't matter. People will try. We pray for success." ("Threat 1");

6

- February 18, 2025, "Take the shot. We'll deal with the fallout . . . Politically, the only solution is impeachment. Realistically, the only solution is violence." ("Threat 2");

- February 20, 2025: "I would twist the knife after sliding it into his fatty flesh." ("Threat 3");

- February 22, 2025: "Skull. Means. Opportunity. Will. I'll take all four today, please. . . . The Ides of March can't get here fast enough." ("Threat 4");

- February 28, 2025: "Target practice tonight. I set some [orange emoticon] on the railing. Let's shoot some oranges! Plink. Plunk. Boom. Bop." ("Threat 5").

In applying the same reasonable person analysis that the Fourth Circuit applied in Lockhart, it is clear that a reasonable person would interpret these threats as showing Stinson was seriously intending to kill the President because the threats were not made in jest, do not constitute political speech, were unconditional, and, most importantly, because Stinson directly and unambiguously, in his own words, conveyed the seriousness of these threats.

First, no reasonable person would take any of Stinson's threats as jokes or made in jest. In considering the context within which these threats were made, the Court should first note that these five threats came within days after Stinson made two posts strongly indicating he was planning something:

- February 7, 2025: "The planning continues. Options discarded. More options created. Looking for an opportunity. A hole in the wall. Only need one. Pick the time. Pick the place. Planning offense not defense. Turning over variations to face and the best plan, the one with the greatest chance of success. Get it done!"

7

- February 8, 2025: "Planning Consideration How much collateral damage is appropriate? If, say, two of the top three targets can be completed, what sort of collateral damage is ok. . . I'd say other fascists and [orange emoticon] sycophants are fair game for sure".

It is clear from context—that is, all of his posts before and after these two posts— that when Stinson is talking about "planning" in these two posts, he is talking about assassinating the President. In the first post he affirmatively declares that the "planning continues" and that he is "looking for an opportunity" and is "planning offense not defense." He never says someone else is doing this planning. In the second post, he clearly explains his "planning" is about the assassination of Trump when he queries his followers on social media as to "how much collateral damage is appropriate" and his own belief that "other fascists and [Trump] sycophants are fair game." These two posts, especially considered in context of all of his other posts about wanting President Trump to die, his willingness to kill President Trump, and his background as a trained law enforcement officer, sharpshooter and FEMA operations specialist, make up the backdrop for Stinson's most concerning threats identified above. See, e.g., Compl. at ¶ 13 ("It involves a rifle and a scope, but I can't talk about it here"); ¶15 ("I would do it. I would take the fall to save America…"); ¶ 19 ("Yes, I would pull the trigger"); ¶ 20 ("I would pull the trigger"); ¶22 ("Let's end this national nightmare now. I'll drive."); ¶ 23 ("Let's just shoot the orange and put him out of his misery"); ¶ 62 ("He needs to be luigied."); and ¶63 ("8647" posts at least 14 times).

In Threat 1, Stinson first speaks directly to law enforcement, telling them they _need_ to find him, because he has "maybe" figured out how to murder the President. It is clear he is speaking to law enforcement because several of his other posts directly address "DHS" and "FBI" and use similar language about how they need to come get him because he has thoughts

they don't like. See Gov't PC Brief at Exhibit A. On one occasion he even acknowledges that he knows Secret Service "will" come to his door, presumably because of the threats he is making against the President. Id. Additionally, his use of the word "maybe" in Threat 1 is very different from the types of disclaimers he previously used, such as when he previously stated he doesn't have the skills to assassinate the President. This time, in Threat 1, Stinson threatens law enforcement with the proposition that "maybe" he's been lying this whole time and he does have the skills, and has, in fact, figured out how to assassinate the President. He then goes on in Threat 2 to affirmatively state that "violence is necessary" and in Threat 3, to threaten that he would "twist the knife" after he slides it into Trump's "fatty flesh." There is nothing funny about graphically describing stabbing someone.

Stinson then proceeds, on February 22 in Threat 4, to threaten to assassinate the President on the Ides of March. Threat 4 is also a serious expression of his intent to harm the President, as opposed to idle talk, because it clearly refers back to the post Stinson made a few days prior, on February 15:

> "Today, someone will have the means and opportunity. Do they have the motive? And the will? . . . He who kills the President to save the country has broken no laws" (emphasis added).

Threat 4 must be interpreted in the context of Stinson's February 15 post, particularly because the two use the exact same odd combination of words—means, opportunity, and will. The distinguishing factor between the two is that on February 15 he affirmatively stated that whoever kills the President to save the country hasn't broken any laws, and then in Threat 4 he identifies the Ides of March as a date he's eagerly waiting for. Standing on its own, Threat 4 could seem like nonsense. But when considered in context with his February 15 post and all of the other

9

threats that came before and after Threat 4, it's clear Stinson is seriously talking about assassinating the President, not joking around.

Threat 5 is similarly very concerning because it constitutes a direct threat to shoot the President by announcing that he's practicing his shooting, on oranges specifically, which he consistently uses to refer to President Trump. Threat 5 is especially serious when considered in context with all of his previous posts about the importance of practicing for anyone who wants to kill the President. For example, on January 13 after the Butler assassination attempt on President Trump, Stinson posts: "three inches to the right, and the shot woulda gone through the eyeball. <u>Practice practice practice</u>. And to die in the process. If you're going to do something big, get it right [winking emoticon]" (emphasis added). Threat 5, standing alone and in context with his prior posts about the importance of practicing when preparing to assassinate the President, was not made in jest. If anything, it can be interpreted as him bragging about his shooting abilities and the fact that he, unlike the shooter in Butler, takes practicing seriously. Indeed, a reasonable person would interpret it as Stinson warning others that he is engaging in target practice in preparation for the assassination attempt that he is planning, all because he affirmatively believes "violence is necessary," as noted in Threat 2.

Notably, not one of Stinson's threats comes with a disclaimer or an indication that he is joking. Stinson never says "just kidding" or "haha" or "lol" after any of his threats. They are all strong and affirmative declarations that he's in the planning stages of an assassination attempt and seriously considering all of his options, including the consequences of "collateral damage." Furthermore, to the extent any of the threats are vague standing on their own, that is by design. This Court must consider each threat in context with Stinson's other posts where he explains he knows better than to post online what he's specifically actually thinking and knows to plan in his

head and not on paper when planning to kill someone. See, e.g., Compl. at ¶ 37 ("2 things I learned this year: the AK is great for <u>killing people</u>, but if your target is a specific target at distance, it's not the best tool. <u>Don't write shit down. Learn to plan in your head, not on paper. & be sure to destroy all evidence before.</u>") (emphasis added).

The seriousness of Stinson's threats is also clear from the nature of the specific, graphic and disconcerting language he chose to use (e.g., Threat 1: "Maybe I've figured out how to pop the orange ball" and Threat 3: "I would twist the knife after sliding it into his fatty flesh") and also because his actual audience did not perceive Stinson's threats as jokes. United States Secret Service and FBI Agents, upon becoming aware of these threats, began investigating Stinson. They took his threats so seriously that USSS Agents themselves hesitated to go interview him, as they normally would other similar targets of investigation. Also, unlike the other protesters at the anti-war rally who laughed at Watts' statement about President Johnson, viewers of Stinson's threats at times tagged the FBI director and deputy director, alerting law enforcement to the fact that Stinson was talking about assassinating the President. See Compl. at ¶ 68. Finally, we know that these threats were not made jokingly because Stinson himself, directly, affirmatively and unambiguously, conveyed the seriousness of his threats when he spoke directly to law enforcement and told them they <u>need</u> to come find him in Threat 1.

Second, Stinson's threats do not constitute "political speech" or "political hyperbole." The Fourth Circuit in <u>Lockhart</u> found that Lockhart's letter didn't constitute political speech, despite containing her thoughts about President Bush's decision to go to war in Iraq, because the letter didn't evidence her intent to engage in political discourse. The same is true here. As discussed above, Stinson's threats were not made in the same context as the statement made in <u>Watts</u>, which involved an anti-war rally at the Washington Monument. Stinson's threats were

11

made openly on social media, and, other than Threat 2, not a single one of them mentioned politics or his views on political issues. In Threat 2, Stinson himself made clear that his threats were not meant to convey his political beliefs, or call for the exchange of ideas, when he explicitly drew a line between the two and threatened: "Politically, the only solution is impeachment. Realistically, the only solution is violence." Here, Stinson himself is explaining that his thoughts of assassinating the President and his belief that violence is necessary are inherently different than his political belief that President Trump must be impeached. When the remaining threats are considered alongside Threat 2, it is clear none of them constitute political speech. Further, in Threat 1, Stinson is presumably speaking directly to law enforcement, telling them they need to come find him, as opposed to speaking to lawmakers or his state representatives, telling them they need to impeach President Trump. Stinson's direct addressing of law enforcement as opposed to lawmakers is akin to Lockhart's decision to hand a Food Lion manager a threatening letter; neither Lockhart's nor Stinson's threats indicated an interest in engaging in political discourse. Lockhart, 382 F.3d at 452.

Finally, Stinson's threats are "true threats" because none of them were conditional. To the contrary, they are affirmative and direct about Stinson's serious intention to kill the President. For example, Stinson does not say that in Threat 2 that "Realistically the only solution is violence" unless President Trump chooses to step down. Stinson also does not say in Threat 3 "I would twist the knife" if I get close enough to "slid[e] it into his fatty flesh." Rather, Stinson tells law enforcement in Threat 1 that they *need* to come find him, because he is *serious* about wanting to harm the President. It truly defies logic to argue that an objective person would be unable to find these threats as serious expressions of Stinson's intent to harm the President when

Stinson himself, in his own words, is calling on law enforcement to come get him because he is unconditionally *serious*.

The defense argues that Stinson's threats do not constitute "true threats" because he often stated he believed he didn't have what it takes to assassinate the President. While the threats identified herein do not contain such disclaimers, the fact of the matter is that even if Stinson had made these threats conditional on his ability to carry them out, or if the Court considers the threats in the context of Stinson's prior disclaimers, the Fourth Circuit has found that neither conditionality nor inability to carry out a threat defeats a true threats analysis. See United States v. Armel, 585 F.3d 182 (4th Cir. 2009) (rejecting defendant's claim that his statements were not a "true threat" because he made statements that were "ridiculous, inherently unthreatening, and conditional" when he threatened FBI employees that they would "never be able to have sex again", would lose their genitalia and would die; a "defendant's inability to carry out a specific threat does not render them unthreatening or harmless" and statements are "true threats" where an ordinary listener could conclude that the statements threatened loss of genitalia and death.) (citing United States v. Roberts, 915 F.2d 889, 890 (4th Cir. 1990); Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 624 (8th Cir. 2002) ("In determining whether a statement amounts to an unprotected threat, there is no requirement that . . . the speaker was capable of carrying out the purported threat of violence")). Therefore, any of Stinson's prior statements that he thinks he doesn't have the skills necessary to kill the President do not render the threats identified herein as protected under the First Amendment. The government need only prove that a reasonable person would interpret Stinson's threats as serious expressions of his intent to harm the President, and at this stage do so under the probable cause standard.

The defense also points to the Ninth Circuit Court of Appeals' decision in United States vs. Bagdasarian, 652 F.3d 1113 (9th Cir. 2011) in support of its argument that Stinson's threats do not constitute true threats, but rather protected speech. The defense's argument is misleading and inapposite for the following reasons: 1) Bagdasarian considers violations of 18 U.S.C. § 879, a statute that the Bagdasarian Court expressly cautions carries a higher burden for conviction than a violation of 18 U.S.C. § 871; 2) Bagdasarian applies a different subjective intent analysis than the kind applicable to a conviction under 18 U.S.C. § 871; and 3) the threats found to constitute protected free speech in Bagdasarian are markedly different than those made by Stinson.

At the outset, the Bagdasarian decision is not applicable to the analysis of whether Stinson's speech constituted "true threats" here because Bagdasarian considered violations of 18 U.S.C. § 879, threats against major political candidates, as opposed to 18 U.S.C. § 871, threats against the President. The Bagdasarian court itself noted that these two statutes carry different levels of conviction, with Section 871 carrying a "lower burden" because, as it's previously held, "'[a] President's death in office has worldwide repercussions and affects the security and future of the entire nation . . . regardless of whether the person making the threat actually intends to assault the President . . .'" Bagdasarian, 652 F.3d at 1117 n.14 (quoting Roy v. United States, 416 F.2d 874, 877 (9th Cir. 1969)). Therefore, comparing Sections 879 and 871 is like comparing apples and oranges.

Stinson's reliance on Bagdasarian is also misplaced because Bagdasarian applies a different analysis for what constitutes a "true threat" here. The Ninth Circuit, in evaluating violations of Section 879, conducted a subjective intent analysis in Bagdasarian that inquired whether the "speaker subjectively intend[ed] the speech as a threat," noting that to determine the

14

answer the court must consider whether "the defendant intended that the statement be understood as a threat." Bagdasarian, 652 F.3d at 1118. This test is irrelevant here. As explained above, under long-standing Fourth Circuit precedent, the only subjective analysis that is appropriate under Section 871 is whether the defendant "knowingly and willingly" threatened to harm the President, the second prong under Section 871 and one which has nothing to do with the first prong, that is, whether the threats constituted "true threats." Such intent can be inferred from evidence that the speaker reasonably anticipated his threats would be communicated to law enforcement. Lockhart, 382 F.3d at 450. Here, as the government explained in its initial brief, the subjective intent element has clearly been met because Stinson directly addressed his statements to law enforcement, at times calling them out by name (i.e., "FBI" and "DHS") and also because commentators were tagging law enforcement in Stinson's posts and alerting them to Stinson's plans to assassinate the president. See Compl. at ¶ 68.

Finally, even though the Bagdasarian court considered a different statute with a higher burden of conviction and applied a subjective intent analysis that is entirely irrelevant here, the speech at issue in Bagdasarian was also objectively far less threatening than Stinson's threats. Bagdasarian involved an individual who, while drunk, posted two statements within a span of 20 minutes and under an anonymous username on a Yahoo! message board concerning then presidential nominee Barack Obama. Bagdasarian, 652 F.3d at 1115. His posts included the statements, "he will have a 50 cal in the head soon" and "Shoot the nig." Id. Secret Service agents located Bagdasarian who admitted to writing the messages. Id. at 1116. Upon searching his house and computer, agents found weapons as well as personal emails discussing guns and shooting at cars, which arguably confirmed the malevolent nature of his previous statements. Id. Bagdasarian was charged with two counts of violating 18 U.S.C. § 879(a)(3) for threatening to

kill and inflict bodily harm upon a major candidate for the office of president of the United States. The Ninth Circuit held that Bagdasarian's two statements were protected, in part, because people in the chat room would have been unlikely to view the statements as seriously expressing an intent to kill or injure Obama, even though four people said they would report Bagdasarian to law enforcement.

Here, we have an entirely different situation. Bagdasarian made two isolated statements in a chat room that, at best, described his own prediction that Obama will die soon and vaguely called for someone to kill Obama. Stinson, on the other hand, spoke directly to law enforcement and through his own personal social media account warning them that they *need* to come find him, after expressing on numerous occasions over five years that he wanted President Trump dead and wished to kill him. Stinson posted over the course of many years—as opposed to two anonymous posts made within 20 minutes—that he is planning an assassination but not detailing those plans publicly because he knows better, that practice is important and he is, in fact, practicing his target shooting, that he personally wanted to "twist the knife" after sliding it into President Trump's "fatty flesh", and that he believed "violence is necessary" to save America. Stinson's threats against the President, especially considered in the context of his other public posts and his background trainings, are exponentially more serious than those of Bagdasarian's.

## CONCLUSION

For the reasons explained above, this government respectfully submits that there is probable cause to find Stinson has violated 18 U.S.C. § 871.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Dated: June 30, 2025                              s/ Sehar F. Sabir
Sehar F. Sabir
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3964
Fax:    (703) 299-3980
sehar.sabir@usdoj.gov

17

**CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

                                               _s/ Sehar F. Sabir_
                                               Sehar F. Sabir
                                               Assistant United States Attorney
                                               United States Attorney's Office
                                               2100 Jamieson Avenue
                                               Alexandria, Virginia 22314
                                               Phone: (703) 299-3964
                                               Fax:    (703) 299-3980
                                               sehar.sabir@usdoj.gov